Anthony C. AGUILAR, a/k/a Tony Aguilar and Susan B. Aguilar, Appellants,

v.

Norris ANDERSON, Lois Anderson and Ronald Anderson, Appellees.

No. 08–91–00369–CV.

Court of Appeals of Texas, El Paso.

May 12, 1993.

Rehearing Overruled June 16, 1993.

Anthony C. Aguilar, Gino Estrada, El Paso, for appellants.

Owen H. Ellington, El Paso, for appellees.

Before OSBORN, C.J., and BARAJAS and LARSEN, JJ.

## OPINION

LARSEN, Justice.

The trial court entered summary judgment in this usury case against plaintiffs Anthony C. Aguilar and Susan B. Aguilar, based upon running of the statute of limitations. Plaintiffs appeal rulings: (1) granting defendants' summary judgment; (2) denying their motion for summary judgment; and (3) refusing to recuse the trial judge, who accepted a campaign contribution from one of plaintiffs' attorneys. We affirm.

## FACTS

Defendants Norris and Lois Anderson sold the Aguilars 39 acres of real estate in rural El Paso County in August 1979. The Aguilars have lived on and farmed the land since that time. The original contract of sale, prepared by plaintiff/appellant Tony Aguilar, an attorney, provided for payment of 9 percent simple interest per annum. The first payment was due January 2, 1983, and the final payment January 2, 2001. The Aguilars sued the Andersons on this contract on January 7, 1981. The parties eventually settled that case, and as part of the settlement prepared a second set of documents transferring the land. The new documents included a warranty deed with vendor's lien, a deed of trust and a promissory note. The parties closed on the second transaction in late August 1982, but all documents were drafted for closing on July 29, 1982. The Aguilars signed the transfer documents and knew they were charged with knowledge of their contents. They made their first payment under the new note on January 2, 1983.

Nonetheless, the present controversy began because the Aguilars claim they did not receive a copy of the second promissory note until 1988, when they allegedly first discovered usury. In Tony Aguilar's affidavit in support of his motion for summary judgment, he states:

By letter dated November 30, 1982, ..., I was told by Mr. Ronald N. Calhoun that my wife and I were obligated to pay interest in the amount of $5,212.28 for the January 2, 1983 payment; that interest was calculated from August 1, 1982 to January 2, 1983. I was also given a computer printout for a new amortization schedule which showed that my wife and I were to pay the sum of $15,013.03 on January 2, 1984, and each succeeding January 2nd for the years 1985 through 1999 and that the final payment would be in the sum of $14,636.36 on January 2, 2000.

.    ..    .    .    .

By letter dated January 29, 1988, I was furnished with a copy of the promissory note signed by my wife and I, dated July 29, 1982. I then wrote Mr. Ronald N. Calhoun concerning the discrepancy between the note and the deed of trust and

the amortization schedule previously furnished to me. I had, before writing him, calculated the interest rate on the note and deed of trust, the interest being charged, the proper interest, and any usurious rates of interest being charged.

The Aguilars filed this suit on June 10, 1988, five and one-half years after their first interest payment to the Andersons.

Both sides filed multiple motions for summary judgment.[1] The trial court denied all of them on March 30, 1989. Both sides again filed motions for summary judgment, and on January 24, 1990, the trial court sent counsel for all parties a letter which read:

> The Defendant's motion for summary judgment is granted on the basis of limitations.

Later, the trial court entered a formal order granting defendants' supplemental motion for summary judgment, second supplemental motion and third supplemental motion. This formal order does not specify the grounds upon which summary judgment was granted.

Before the trial court granted defendants' summary judgment, the Aguilars filed their motion to recuse him. After hearing before the presiding judge, this motion was denied.

This appeal follows.

## RECUSAL

In their Point of Error Five, the Aguilars claim that the presiding judge abused his discretion in refusing to order the trial judge's recusal. This claim is based upon the trial judge's solicitation and acceptance of a campaign contribution from attorney Ron Calhoun and his law firm.[2]

In December 1989, the trial judge telephoned Mr. Calhoun and solicited campaign contributions from his law firm. Calhoun's firm gave the campaign $300, $100 from each partner (the judge's self-imposed limit on contributions). Shortly afterward, the judge heard defendants' first amended motion for summary judgment and, after hearing, he warned the parties that they should settle their differences or he would do it for them. The parties did not settle the case, and the Aguilars filed their motion to recuse, urging that the campaign contributions created a situation where the judge's impartiality could reasonably be questioned. The presiding judge held a hearing and refused to order a recusal. The trial judge later granted summary judgment for defendants.

■■■ The standard of review for denial of a motion to recuse is abuse of discretion. *J–IV Investments v. David Lynn Machine, Inc.*, 784 S.W.2d 106, 107 (Tex.App.—Dallas 1990, no writ); *Petitt v. Laware*, 715 S.W.2d 688, 692 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. That the trial court decided an issue differently than would this reviewing Court does not necessarily demonstrate an abuse of discretion, nor does a mere error in judgment amount to such an abuse. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985); *Loftin v. Martin*, 776 S.W.2d 145, 146 (Tex.1989).

1. Not just motions for summary judgment, but exhibits and pleadings were repeatedly filed by both sides for no apparent reason. It appears every piece of paper filed below was included in the appellate record, as well. The record on appeal is seven volumes, approximately ten inches thick. The reading in open court of the original settlement agreement appears in the record 19 times, by this writer's count. The deed of trust and promissory note at issue appear 22 times. Plaintiffs filed *eleven* amended petitions, all of them included in this record, although ten were superseded. A like number of answers and counterclaims by defendants appear in the record. To bring such a voluminous record before this Court was totally unnecessary.

2. The Andersons' attorney of record throughout this case has always been, and remains, Owen Ellington. Mr. Calhoun, who maintains offices in the same building with Mr. Ellington, appeared on his behalf once or twice during the course of litigation. There is no allegation that Mr. Ellington ever contributed to the trial judge's election campaign. Nevertheless, because Calhoun drafted the promissory note at issue, and because he did appear on behalf of the Andersons during this litigation, we will assume he was their attorney.

Texas law at the time of this decision required that:

> Judges shall recuse themselves in proceedings in which their impartiality might reasonably be questioned.... TEX.R.CIV.P. 18b(2).

Texas courts have repeatedly rejected the notion that a judge's acceptance of campaign contributions from lawyers creates bias necessitating recusal, or even an appearance of impropriety. *J–IV Investments*, 784 S.W.2d at 107; *Rocha v. Ahmad*, 662 S.W.2d 77, 78 (Tex.App.—San Antonio 1983, no writ); *Texaco, Inc. v. Pennzoil, Co.*, 729 S.W.2d 768, 844–45 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert. dismissed*, 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988). In an oft-quoted passage, one court of appeals has observed:

> It is not surprising that attorneys are the principal source of contributions in a judicial election. We judicially know that voter apathy is a continuing problem, especially in judicial races and particularly in contests for a seat on an appellate bench. A candidate for the bench who relies solely on contributions from non-lawyers must reconcile himself to staging a campaign on something less than a shoestring. If a judge cannot sit on a case in which a contributing lawyer is involved as counsel, judges who have been elected would have to recuse themselves in perhaps a majority of the cases filed in their courts. Perhaps the next step would be to require a judge to recuse himself in any case in which one of the lawyers had refused to contribute or, worse still, had contributed to that judge's opponent. *Rocha*, 662 S.W.2d at 78, quoted in *J–IV Investments*, 784 S.W.2d at 108 and *Texaco, Inc.*, 729 S.W.2d at 843–44.

Thus, there is a sound basis in law for the presiding judge's decision denying recusal, where the sole ground was that the judge solicited and accepted campaign contributions from a lawyer representing parties in his court. *J–IV Investments*, 784 S.W.2d

at 108. Here, the contribution was small, the trial judge maintained a voluntary policy of accepting only very limited contributions from any single source and the contributing lawyer was not even lead attorney for defendants. We cannot say, under these circumstances, that the presiding judge acted without reference to guiding principles.

In reaching this decision, the Court does not lightly dismiss the ethical dilemma posed by our system where an elected judiciary seeks campaign contributions from lawyers,[3] nor do we lightly dismiss the heated criticism this system has generated. Both dissent and concurrence make cogent and thought-provoking arguments on the problems inherent in this elective scheme. We simply hold that, under these facts, the presiding judge did not act outside the bounds of discretion in deciding the recusal motion. We overrule the Aguilars' Point of Error Five.

## STATUTE OF LIMITATIONS

■ The Aguilars' Points of Error One, Three and Four address the trial court granting summary judgment for defendants based on running of the four-year statute of limitations. On November 30, 1982, Ron Calhoun, as attorney for the Andersons, sent Tony Aguilar a letter and amortization schedule as part of the settlement of the earlier lawsuit concerning the 39 acres. Calhoun's letter explained that he had calculated interest from August 1, 1982 to January 2, 1983, at a rate of 9 percent per annum, or $33.846 per day. The letter affirmatively requests that the Aguilars review the payment schedule, saying:

> Unless I hear from you to the contrary, I will assume that our calculations are accurate and that the amortization schedule is acceptable.

According to their settlement agreement, August 1, 1982 was the date the new contracts were to have been signed between

---

**3.** That this conundrum has produced three separate opinions from a three-judge panel, who nevertheless all agree that the trial court reached the correct outcome on the merits of the case, indicates how serious the issue is and how difficult any solution.

the parties. The closing was not actually completed however, until later in August. The Aguilars made their first payment under the new promissory note on December 28, 1982. This lawsuit was filed June 10, 1988, five and one-half years after that first payment.

Texas law provides that an action for usury:

> [S]hall be brought in any court of this State having jurisdiction thereof within four years from the date when the usurious charge was *received* or *collected....* [Emphasis added]. TEX.REV.CIV.STAT. ANN. art. 5069–1.06(3) (Vernon 1987).

The Andersons' receipt of interest under the allegedly usurious contract triggered the limitations period, regardless of the amount of interest paid at that time. *Cook v. Frazier*, 765 S.W.2d 546 (Tex.App.—Fort Worth 1989, no writ). Thus, the four-year statute of limitations began to run on the Aguilars' claim when they made the first payment under the promissory note, on December 28, 1982. It had clearly expired by the time they filed their lawsuit in 1988. The trial court correctly entered summary judgment for defendants on this ground. We overrule Points of Error One, Three and Four.

## DISCOVERY RULE

■ In their Point of Error Two, the Aguilars argue that the discovery rule should have prevented the entry of summary judgment against them. Under the discovery rule, courts calculate the statute of limitations from the date plaintiff discovered or, in the exercise of reasonable diligence, should have discovered that plaintiff possessed a cause of action. Courts limit the rule to only those claims which are "inherently undiscoverable." *Johnson v.*

*Abbey*, 737 S.W.2d 68, 69 (Tex.App.—Houston [14th Dist.] 1987, no writ).

■ The Texas Supreme Court, in discussing the discovery rule, has stated:

> Limitations statutes afford plaintiffs what the legislature deems a reasonable time to present their claims and protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise. The purpose of a statute of limitations is to establish a point of repose and to terminate stale claims. *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex.1990) [Citations omitted].

See also, *Brown v. KPMG Peat Marwick*, 856 S.W.2d 742 (Tex.App.—El Paso 1993, n.w.h.).

The Aguilars cite no authority, and we have found none, which would apply the discovery rule to usury claims. We decline to expand the discovery rule under the facts of this case. The Aguilars were given ample opportunity to review and recompute the amortization schedule prepared by attorney Calhoun before they completed settlement of the first lawsuit in 1982. They were just as capable of figuring a payment schedule for the principal amount, based upon 9 percent interest, as were defendants in this case. Indeed, they were specifically invited to do so by Calhoun in November 1982, more than a month before their first interest payment was due. This is not the sort of "inherently undiscoverable" situation where we feel that due process and public policy require the imposition of a discovery rule. We overrule Point of Error Two.[4]

---

**4.** We note two additional theories supporting summary judgment here.

First, a simple mistake is one basis for this lawsuit. No one asserts that any payment was actually due for the year 2001. This was an error and all parties have acknowledged as much. The law is clear that there shall be no penalty for any usurious interest which results from an accidental and bona fide error. TEX. REV.CIV.STAT.ANN. art. 5069–1.06(1).

Second, the promissory note on its face calls for interest calculated at the rate of 9 percent per annum, which is not usurious. The terms setting out the actual amount of each yearly payment are the source of the usury claim here. The note is therefore ambiguous as to the rate of interest charged. Where a transaction is ambiguous on the issue of usury, a saving clause contained within it mandates court interpretation so as to avoid violation of the usury laws.

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

As the statute of limitations had run on their claim of usury, the trial court did not err in overruling the Aguilars' motion for summary judgment urging they had proven that defendants had charged usurious interest as a matter of law. We overrule Point of Error Six.

## CONCLUSION

The trial court properly entered summary judgment in this case. The presiding judge did not abuse his discretion in overruling the Aguilars' motion to recuse the trial judge. We affirm the trial court's judgment that plaintiffs Aguilars take nothing in this cause.

OSBORN, Chief Justice, concurring.

In a case of first impression in this state, this Court is required to decide what conduct upon the part of a trial judge might result in that judge's impartiality being reasonably questioned. In this case, the issue is limited to a question arising from the solicitation and receipt of a campaign contribution. The issue is further narrowed by the fact that the contribution in this case was solicited by the judge personally and the amount received was small. The contribution did not come from an attorney of record but from an attorney who may be considered to have something other than a financial interest in the case and whose affidavit was filed in support of the motion for summary judgment which the trial court granted some two months after the contribution was made.

The case raises the following issues:

(a) Is the amount of the contribution a controlling issue?

(b) Is the time between the receipt of a contribution and a court ruling a controlling issue?

(c) Is the determination that the contribution was not made by an attorney of record a controlling issue?

(d) Is the determination that the contribution was solicited by the judge personally a controlling issue?

### Standard of Review

In 1984, the Supreme Court of Kansas in *State v. Logan*, 236 Kan. 79, 689 P.2d 778 (1984) considered the question of disqualification under a Canon which provided that "a judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned." *Logan*, 689 P.2d at 784. The Court said it was required to determine whether "a reasonable person on the street"—not the judge, the litigant or his attorney—would question the judge's impartiality. *Id.* The Court went on to find no appearance of partiality, but it concluded that even if there was a basis for holding that a recusal was required, the appellate court should apply a harm test and determine if there had been a showing of bias or prejudice before deciding that there was reversible error.

In 1987, the Supreme Court of Alabama in *Collins v. Windsor*, 505 So.2d 1205 (Ala. 1987) in construing the same Canon as the Kansas Court said:

Under the Canon 3C(1) recusal test adopted by this Court, a judge should disqualify himself if a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find that there is a reasonable bias for questioning the judge's impartiality.

*Collins*, 505 So.2d at 1208.

We conclude that it is as the Kansas Court said the "reasonable person on the street" test which must be used. After all the impartial standard has been adopted in order that the public, i.e., the person on the street, might have confidence in the judiciary and to protect judges from unjustified complaints about their being partial in their

---

*Nevels v. Harris,* 129 Tex. 190, 102 S.W.2d 1046, 1049–50 (1937). There is such a saving clause in the promissory note here ("[i]t is the intention of the parties hereto to conform strictly to the usury laws of the State of Texas ...."). Thus, the trial court was required to interpret

the note such that the parties complied with the usury laws.

Summary judgment could equally well have been entered on these two theories, and they were both before the trial court when judgment was entered.

decision. But, that "reasonable" person must be aware of the "facts of life" which surround the judiciary. In states which elect judges, the "reasonable" person must know that judges have to stand for election on a regular basis, that elections cost money and that in metropolitan areas and in state-wide races those races are very expensive for an effective campaign. Stuart Banner, *Disqualifying Elected Judges from Cases Involving Campaign Contributors*, 40 STAN.L.REV. 449, 452–55 (1988). That "reasonable" person must also know that in judicial races most contributions are made by practicing attorneys. Mark Andrew Grannis, *Safeguarding the Litigant's Constitutional Right for Fair and Impartial Forum: A Due Process Approach to Improprieties Arising from Judicial Campaign Contributions from Lawyers*, 86 MICH.L.REV. 382, 408 (1987). We might even expect the "reasonable" person to have some knowledge as to the motives for contributing to a judicial campaign. 40 STAN.L.REV. at 478–90.

### Amount of a Contribution

The Courts in Florida dealt with the question of whether a contribution of $500 was sufficient to establish a disqualification of a trial judge where the contribution was made not to the judge but to the judge's spouse who was involved in a judicial campaign. The Court of Appeals in a 5 to 4 decision ruled that the trial judge was disqualified. *Breakstone v. MacKenzie*, 561 So.2d 1164 (Fla.Dist.Ct.App.1989).[5] The Florida Supreme Court, on the issue of the amount, reversed with three concurring opinions. *MacKenzie v. Super Kids Bargain Store, Inc.*, 565 So.2d 1332 (Fla.1990). The Court reached that result in part based upon Florida's statutory limitation on campaign contributions which permitted contributions to a candidate for a circuit judge (for which the trial judge's husband was a candidate) of $1,000. Currently, Texas has

no such statute and much has been made, and rightly so, of one contributor giving $200,000 to a candidate for the Texas Supreme Court. 40 STAN.L.REV. at 460. I have no problem in concluding that in a county with a population of over 500,000, a self-imposed restriction of $100 per contributor is most reasonable and should never result in a determination that the judge's impartiality could be reasonably questioned. I would reach the same results as the Florida Supreme Court if the contribution was $500. I do not believe the "reasonable person on the street" would conclude that receipt of a $100 contribution or even a $500 contribution, with today's standards and cost of campaigns, would result in a trial judge being biased or prejudiced.

To go further is surely dicta, but should there be a bright-line-test; where do you draw the line? Clearly, there should be a limit and the line should be drawn by the legislature.[6] Until limits are established, cases must be decided on a case-by-case basis. In this case, I conclude that the amount of the contribution was not grounds for sustaining the Motion to Recuse.

### Time of Ruling

In this case, the time between the giving of the contribution and the ruling on the motion causes greater concern than the amount of the contribution. Courts must take note of timing considerations if they are to reach an accurate conclusion about contributions which are in other respects questionable. 86 MICH.L.REV. at 404. Although the record does not reflect these facts, it seems unlikely that the trial judge knew in December when the contribution was solicited and received that the Motion for Summary Judgment either was or would be set for hearing within about two months. But, he did know from prior hear-

---

**5.** The majority opinion notes in footnote 10 that the size and nature of contributions permitted under the Texas standard has been the subject of much criticism.

**6.** For a recommendation as to voluntary limitations on contributions to candidates for particu-

lar state-wide and local judicial offices, *see* Darrell Jordan, *Financing Judicial Campaigns: A Crisis in Public Confidence*, 52 TEX. B.J. 1248 (1989). His suggestion was a cap of $3,000 for most district court elections.

ings that the case was pending and rulings would be required at some future date. We have no bright-line-test which says a judge may be disqualified from ruling on a motion the day after receiving a contribution from one interested in a particular case but will not be disqualified a week, or a month or a year later. Knowing no standard by which to review this issue, I arbitrarily conclude that in this case the time of the ruling was not such as to require this Court to hold that the trial judge's impartiality might be reasonably questioned and was not grounds for sustaining the Motion for Recusal.

### Contribution by One Not Attorney of Record

Again there is no bright-line authority that provides for sustaining a motion for recusal depending on whether the contribution is made by a litigant, an attorney of record or a person having an interest in the case. In the interest of protecting both the public and the members of the judiciary, it would appear that any rule with regard to contributions and recusal because the judge's impartiality might be reasonably questioned should apply equally to litigants, their attorneys and others with an interest in the litigation. I would find no basis for a recusal in this case even if the contribution came from the attorney of record.

### Solicitation by the Trial Judge

Texas has not adopted Canon 5 C(2) of the American Bar Association Model Code of Judicial Conduct. That provision of the Model Code provides that a candidate for a judicial office shall not personally solicit or accept campaign contributions. Under the Model Code, only established committees of responsible persons may solicit and accept reasonable campaign contributions. Until such time as the Model Code provision is adopted, Texas judges may continue to solicit campaign contributions.[7]

While prior to the February 10, 1988 amendment to Canon 5 B(2), Texas judges may have been prohibited from soliciting funds for any political organization, including their own, that restriction was removed long before the solicitation in this case in December 1989. Thus, there was no violation of the Code of Judicial Conduct in the solicitation made by the trial judge in this case. If this Court is to conclude that a trial judge who has personally solicited campaign contributions, with a self-imposed limitation of $100 per contributor, is disqualified when that contributor appears in court, then many trial and appellate judges may soon be faced with valid recusal motions.

### Conclusion

I conclude that the trial judge was not disqualified to hear the Motion for Summary Judgment, that there has been no showing of bias or prejudice and that the solicitation and receipt of a $100 contribution as a matter of law does not result in the trial judge's impartiality reasonably being questioned.[8]

---

**7.** This conduct seems to have been encouraged when the Texas Supreme Court in February 1988 amended Canon 5 B(2) to remove the provision that a judge should not solicit funds for any "political" organization. 51 Tex.B.J. 396 (1988). Prior to that amendment, the Judicial Ethics Committee in Opinion Number 10, had noted that Canon 5 B(2) manifests the clear prohibition that "[a] judge should not solicit funds...." *Texas Judicial Service Handbook* p. 140 (1990). All doubt was removed when Canon 5C(1) was amended in December 1989 to provide that the limitation on financial and business dealings "does not prohibit either a judge or candidate from soliciting funds for appropriate campaign or officeholder expenses as permitted by law." 53 Tex.B.J. 240–41 (1990).

**8.** The record in this case, as noted in Justice Larsen's footnote, shows the folly of amending the rules to provide that the clerk of the court shall prepare the transcript to include the live pleadings upon which the trial was held. Tex. R.App.P. 51. While the attorneys may designate parts of the record to be included in the transcript, most do not and there is no penalty for failure to do so. How is a deputy clerk with no legal training supposed to decide what are the "live pleadings" particularly in multiple party cases where there are cross-actions, answers, pleadings for indemnity and other relief? Why do we place that responsibility upon a deputy clerk with no legal training, rather than the attorneys with that training who are charging clients substantial rates for the appeal? Had the attorneys in this case designated only the last

I concur both as to the determination of the recusal question and as to the harm analysis which reflects no reversible error regardless of the determination of the recusal question.

BARAJAS, Justice, concurring and dissenting.

I find myself in strong disagreement with the members of the majority panel and record my respectful dissent. The majority and separate concurring opinions have this day effectively sanctioned as legitimate judicial conduct, a political campaign strategy by which a jurist can personally put the financial "pinch" on an attorney or party involved in pending litigation in order to fund his re-election campaign so long as it is a pinch and not a "squeeze."

In Appellants' fifth point of error, it is asserted that the presiding judge at the hearing on his Motion To Recuse abused his discretion in refusing to recuse the trial judge because the acts of the trial judge were contrary to the standards of conduct promulgated by the Texas legislature, the Texas Rules of Civil Procedure and the Code of Judicial Conduct. Specifically, Appellants have questioned the trial judge's impartiality. Appellants' concern is based on the fact that the trial judge, during the pendency of a contested case, and knowing that a motion for summary judgment filed by Appellees was pending and would be

heard by him two weeks later, personally telephoned an attorney who had made an appearance on behalf of Appellees and whose supporting affidavit was affixed to their motion for summary judgment as summary judgment proof, for the purpose of soliciting and accepting a re-election campaign contribution from that attorney and his law firm.[9] Under the unique circumstances of the instant case, I would find that the trial judge's impartiality might reasonably be questioned and would sustain Appellants' fifth point of error.

## I. PROCEDURAL HISTORY

The majority opinion is based at least in part on a deficient and inaccurate chronology of events. More precisely, the record shows that Appellants filed their usury action against Appellees on June 10, 1988. Appellees' answered by entering their general denial on August 2, 1988. The appellate record, consisting of over 2,000 pages of documents, exclusive of any statement of facts, establishes that a plethora of affidavits, amendments, answers, attachments, briefs, cases, certificates, counterclaims, depositions, exceptions, exhibits, interrogatories, letters, memoranda, motions, notices, objections, orders, petitions, pleas, requests, responses, sets and various supplements were filed from the date of the Original Petition to the date Appellants' Motion to Recuse was filed.[10] Included among the

---

pleadings and motions which superseded all others, the cost of appeal would have been substantially reduced and the time to review the record to locate only the "live pleadings" would have been greatly reduced. Perhaps requiring an appellant to designate the exact instruments · to place in the transcript is too much to ask of professionals. *See Texas Employers' Insurance Association v. Stodghill,* 570 S.W.2d 398, 402 (Tex.Civ.App.—El Paso 1978), reversed, 582 S.W.2d 102 (Tex.1979).

**9.** *The majority opinion suggests that Appellant's Motion to Recuse is based upon the "trial judge's solicitation and acceptance of a campaign contribution from [an attorney] and his law firm." The issue however, is not whether the trial judge, or the attorney* **did** *anything wrong, but rather, whether what the trial judge did was such that his impartiality might* **reasonably** *be questioned. See* Tex.R.Civ.P. 18b(2) (Vernon Supp.1988). *For that reason, I render*

no opinion, either express or implied, on the **actual** propriety or impropriety of the actions of the trial judge in the instant case. Moreover, it is not the prerogative of this Court to either write, modify or amend any rule of procedure or code of conduct. Neither is it my intent to formulate a suggested method of compliance. Accordingly, I limit my comments to the analysis of the events of this case.

**10.** The record shows that between the date of filing of the Original Petition commencing this action and the date Appellant's Motion to Recuse was filed, that no less than 10 affidavits, 14 amendments, 4 trial briefs, 4 letters, 2 memoranda of law, 5 motions, 12 notices, 7 objections, 9 orders, 8 responses, 3 special exceptions, 8 supplements and various other documents were in the trial court's file. Moreover, the trial judge, at the hearing on the motion to recuse, testified that he specifically remembered telling Appellant that he thought this case had

above documents were Appellants' and Appellees' respective motions for summary judgment, both amended and supplemental. Appellants' initial Motion for Summary Judgment was filed December 12, 1988. Appellees' initial Motion for Summary Judgment, filed February 2, 1989, was based, at least partially, on the affirmative defense of limitations. TEX.REV.CIV.STAT. ANN. art. 5069–1.06(3) (Vernon 1987) and TEX.CIV.PRAC. & REM.CODE § 16.004 (Vernon 1986). On March 30, 1989, the trial court denied both parties' motions for summary judgment. On August 9, 1989, Appellees filed their First Amended Motion for Summary Judgment. On October 3, 1989, the trial judge entered his order resetting a hearing on Appellees' First Amended Motion for Summary Judgment. The hearing was set for December 22, 1989. Appellees' First Amended Motion for Summary Judgment was likewise based on the affirmative defense of limitations. TEX.REV.CIV.STAT. ANN. art. 5069–1.06(3) (Vernon 1987) and TEX.CIV.PRAC. & REM.CODE § 16.004 (Vernon 1986). The First Amended Motion for Summary Judgment relies largely on the Appellants' responses to Appellees' Requests for Admission, filed November 2, 1988, approximately three months prior to the filing of Appellees' *original* Motion for Summary Judgment. The record shows that in early December 1989, prior to the date of the scheduled hearing, the trial

judge filed his application for designation of his own campaign treasurer. The record additionally shows that during that time in early December 1989, and while Appellees' First Amended Motion for Summary Judgment was pending, the trial judge personally telephoned an attorney who had made an appearance on behalf of Appellees, and whose supporting affidavit was affixed to Appellees' then-pending motion for summary judgment as summary judgment proof, and solicited a financial contribution for his re-election campaign.[11] On December 6, 1989, that attorney delivered check number 14242 in the amount of $300 to the trial judge.[12]

On December 22, 1989, the trial judge held the scheduled hearing on Appellees' First Amended Motion for Summary Judgment. Subsequent to the hearing, but before the trial judge decided the pending motion, Appellees filed their Supplemental Motion for Summary Judgment, accompanied by the supporting affidavit of the attorney who had given the trial judge a financial contribution. On January 16, 1990, a meeting was held in the trial judge's chambers at which time the judge told the parties that the case was to be settled or the case would be settled by the court. On February 8, 1990, the trial judge granted Appellees' First Amended Motion for Summary Judgment.[13]

"gotten totally out of hand, that it seemed like almost weekly [they] were having some kind of emergency hearing of one kind or another always over petty things...."

11. The nature of the summary judgment proof, i.e., the attorney's affidavit, was such that the trial judge receiving the timely campaign contribution would be asked to pass on the credibility of the attorney giving him the contribution in determining whether to grant or deny Appellee's First Amended Motion for Summary Judgment.

12. The record shows that the $300. financial contribution, representing $100 from each member of the attorney's firm, was properly reported in the candidate's financial disclosure form. The attorney, at the hearing on the motion to recuse, acknowledged that most law firms give money, but that under the facts in this case, "there is absolutely nothing wrong with what was done by me or by [the trial judge]."

13. The Order Granting Defendants' First Amended Motion for Summary Judgment was based on the running of the statute of limitations. The trial judge additionally granted partial summary judgment in favor of Appellees on Appellants' claim of usury. The majority and separate concurring opinions, in their brief procedural history pertinent to this point of error, fail to note that after the trial judge denied Appellees' initial motion for summary judgment, an amended motion for summary judgment was filed. The basis for each of the motions was essentially identical, i.e., the affirmative defense of limitations. The separate opinions likewise fail to mention that the summary judgment proof submitted with each of the motions was essentially identical. Finally, the separate opinions fail to mention that between the date the original motion for summary judgment was denied and the amended motion for summary judgment granted, was the personal solicitation and acceptance of a political contribution.

On June 20, 1990, Appellant Tony C. Aguilar filed his Motion to Recuse the trial judge. Appellants' Motion to Recuse was filed pursuant to Tex.R.Civ.P. 18b(2) (Vernon Supp.1988), and further predicated on Canons 1 and 2 B of the Texas Code of Judicial Conduct (Vernon 1988). On August 24, 1990, a hearing was conducted on Appellants' Motion to Recuse. After considering the pleadings and attached affidavits as well as the argument of counsel, the judge assigned to hear the Motion to Recuse found that the trial judge possessed no personal bias or prejudice against Appellants which would have precluded Appellants from obtaining a fair and impartial trial. The recusal judge further found that the alleged prejudice upon which Appellants' Motion to Recuse was based did not stem from any extrajudicial source, but was based upon the trial judge's in-court rulings in the course of the trial.[14]

The record further shows that sixty seconds after the Order Denying Recusal was filed, Appellees filed their Second Supplemental Motion for Summary Judgment which was later complemented by their Third Supplemental Motion for Summary Judgment. On June 27, 1991, the trial judge denied Appellants' Second Motion for Summary Judgment and granted all of Appellees then-pending supplemental motions for summary judgment.[15]

## II. DISCUSSION

The majority opinion correctly sets out the very stringent standard of review for denial of motions to recuse, i.e., whether or not the trial court abused its discretion. *Petitt v. Laware*, 715 S.W.2d 688, 692 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.); Tex.R.Civ.P. 18a(f) (Vernon Supp. 1988). The test for abuse of discretion is not whether, in the opinion of this Court, the facts present an appropriate case for

the trial court's actions. Rather, it is a question of whether the court acted without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), citing *Craddock v. Sunshine Bus Lines*, 134 Tex. 388, 133 S.W.2d 124, 126 (Tex.Comm.App.—1939, opinion adopted). Another way of stating the test is whether the act was arbitrary or unreasonable. *Id.* 701 S.W.2d at 242, citing *Smithson v. Cessna Aircraft Co.*, 665 S.W.2d 439, 443 (Tex. 1984); *Landry v. Travelers Insurance Co.*, 458 S.W.2d 649, 651 (Tex.1970). This writer fully recognizes that the mere fact that a trial court may decide a matter within its discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer*, 701 S.W.2d at 242, citing *Southwestern Bell Telephone Co. v. Johnson*, 389 S.W.2d 645, 648 (Tex.1965) and *Jones v. Strayhorn*, 159 Tex. 421, 321 S.W.2d 290, 295 (1959). A mere error of judgment is not an abuse of discretion. *Loftin v. Martin*, 776 S.W.2d 145, 146 (Tex.1989).

Insofar as there appears to be much confusion as to the distinction between judicial disqualification and recusal of judges, I turn to the Texas Constitution, the Texas Rules of Civil Procedure and the Texas Code of Judicial Conduct for proper determination of the guiding rules and principles on which the recusal judge was bound to rely.

Disqualification and recusal are not synonymous terms. Disqualification of a judge on the constitutional grounds of interest, relationship to a party or having served as counsel in the case is absolute. Tex. Const. art. V, § 11. Disqualification cannot be waived and can be raised at any time, even by a collateral attack of the

---

14. As noted earlier, Appellants' Motion to Recuse was based on Tex.R.Civ.P. 18b(2) (Vernon Supp.1988). Appellants have not asserted that the trial judge possessed a personal bias or prejudice against him so as to preclude him from obtaining a fair and impartial trial, as suggested in the Order Denying Recusal. The Order Denying Recusal is totally silent as to whether the conduct of the trial judge was such

that his impartiality might reasonably be questioned.

15. The record shows that the Order Denying Recusal was entered at 1:51 p.m. on December 6, 1990. Defendants' Second Supplemental Motion for Summary Judgment was filed at 1:52 p.m. on December 6, 1990.

judgment. *Buckholts Independent School District v. Glaser*, 632 S.W.2d 146, 148 (Tex.1982), *citing Fry v. Tucker*, 146 Tex. 18, 20, 202 S.W.2d 218, 220 (1947). On the other hand, recusal of a judge on any ground not enumerated as disqualifying in the Texas Constitution is governed by statute and rule. A party waives its right to recusal of a judge if it does not raise the issue in a proper motion. Recusal of a trial judge cannot be urged for the first time on appeal. *Id.* 632 S.W.2d at 148; *Amsav Group, Inc. v. American Savings and Loan Association of Brazoria County*, 796 S.W.2d 482, 485 (Tex.App.—Houston [14th Dist.] 1990, writ denied). The trial judge must voluntarily recuse or refer the motion to the presiding judge of the administrative district to assign a judge to hear such motion. *Dunn v. County of Dallas*, 794 S.W.2d 560 (Tex.App.—Dallas 1990, no writ); TEX.R.CIV.P. 18a(c). *See generally* William W. Kilgarlin & Jennifer Bruch, *Disqualification and Recusal of Judges*, 17 ST. MARY'S L.J. 599, 652 (1986)

On December 6, 1990, the judge assigned to hear the Motion to Recuse entered his "Order on Plaintiffs' Motion to Disqualify Judge." The voluminous pleadings on file in the instant case fail to advance any allegations that the trial judge was **constitutionally** disqualified to sit in judgment of the instant case. To the contrary, Appellants' Motion to Recuse is based exclusively on nonconstitutional grounds. Any authorities interpreting the constitutional impediments to judges sitting on cases in which they have an interest, are related to a party to the litigation, or have previously served as counsel are not dispositive of the present dispute and thus, cannot be the basis for guiding rules and principles on which the recusal judge could safely rely in denying Appellants' Motion to Recuse.

Having properly set aside provisions of the Texas Constitution as being purported guiding principles on which the recusal judge based his denial of Appellants' Motion to Recuse, I now turn to the Texas Rules of Civil Procedure, as well as pertinent portions of the Texas Code of Judicial Conduct which were in effect at the time of the hearing.

TEX.R.CIV.P. 18b(2) (Vernon Supp.1988), in effect at the time Appellants' Motion to Recuse was filed and heard, provided in pertinent part:

> Recusal. **Judges shall recuse themselves in proceedings in which their impartiality might reasonably be questioned,** including but not limited to, instances in which they have a personal bias or prejudice concerning the subject matter or a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.[16] [Emphasis added].

The majority opinion cites *J–IV Investments v. David Lynn Machine, Inc.*, 784 S.W.2d 106 (Tex.App.—Dallas 1990, no writ); *Rocha v. Ahmad*, 662 S.W.2d 77, 78

---

**16.** TEX.R.CIV.P. 18b(2) underwent extensive revision by order of April 24, 1990, effective September 1, 1990, and currently provides as follows:

**(2) Recusal**

A judge shall recuse himself in any proceeding in which:

(a) his impartiality might reasonably be questioned;

(b) he has a personal bias or prejudice concerning the subject matter or a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(c) he or a lawyer with whom he previously practiced law has been a material witness concerning it;

(d) he participated as counsel, adviser or material witness in the matter in controversy, or expressed an opinion concerning the merits of it, while acting as an attorney in government service;

(e) he knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding

(f) he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iii) is to the judge's knowledge likely to be a material witness in the proceeding.

(g) he or his spouse, or a person within the first degree of relationship to either of them, or the spouse of such a person, is acting as a lawyer in the proceeding.

(Tex.App.—San Antonio 1983, no writ); and *Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), in support of the proposition that the recusal judge did not abuse its discretion in denying the Motion to Recuse. The separate concurring opinion cites no authorities from our jurisdiction. *Texaco* was a case in which our Texas Supreme Court refused writ, no reversible error.[17] No application for writ of error was filed in *J–IV Investments* or in *Rocha*, neither was reviewed by our higher court and, thus, they are persuasive but not binding on the other intermediate appellate courts of our state.

In *J–IV Investments*, a case very similar to the instant case, the movant on a motion to recuse complained of the trial court's failure to disclose information which may have been the basis for recusal and of the denial of its "Motion for Retroactive Recusal." *J–IV Investments*, 784 S.W.2d at 107. The jury in that case returned its verdict on July 5, 1988. Both sides filed motions for judgment which the court took under advisement. In September 1988, counsel for Defendant David Lynn Machine, Inc. made a $500 contribution to the trial judge's campaign fund. On December 21, the court granted that party's motion for J.N.O.V. The trial judge's term ended on December 31, 1988, and his successor took office January 1, 1989. J–IV Investments claimed no knowledge of the campaign contribution until after rendition of the judgment. J–IV Investments filed its motion for retroactive recusal which was denied by an assigned judge. While I certainly view *J–IV Investments* to be most persuasive, I would decline to follow its holding insofar as its opinion wholly fails to state the basis on which the motion to recuse was founded.[18] Further, that court relied upon cases holding that campaign

contributions do not create bias which would prompt recusal. As noted, this fails to account for the statute requiring recusal whenever a trial court's impartiality may reasonably be questioned, regardless of any actual bias the judge may hold.

In *Rocha*, attempt was made to "recuse or disqualify" two justices on the San Antonio Court of Appeals who received "many thousands of dollars" from or through the law offices of the Appellees' attorney. *Rocha*, 662 S.W.2d at 77. Additionally, "victory" celebrations were allegedly held at the law offices of that attorney for the two justices after their election to the Court of Appeals. Appellant asserted that the challenged judges should recuse themselves or be disqualified "in view of the provisions of the Texas Code of Judicial Conduct, Canons 2 and 3." The *Rocha* Court, *citing Maxey v. Citizens National Bank of Lubbock*, 489 S.W.2d 697 (Tex.Civ.App.—Amarillo 1972), *rev'd on other grounds*, 507 S.W.2d 722 (Tex.1974), held that Canons 2 and 3 of the Texas Code of Judicial Conduct did not have the force of law and further, apparently interpreting TEX. CONST. art. V, § 11, held that even assuming that Canons 2 and 3 had the force of law, there would be no **constitutional** impediment to the challenged justices sitting in judgment. Once again, I would decline to follow the holding of the *Rocha* Court insofar as its holding hinged on a constitutional interpretation of "interest" and the Code of Judicial Conduct, rather than on an interpretation of established rules of procedure then in effect. The Motion to Recuse in the instant case was premised on those Rules of Civil Procedure, not constitutional grounds.

Finally, Appellees rely on *Texaco*, an aberration, as authority for judicial ethics in our jurisdiction, in support of the recusal judge's actions in denying Appellants' Motion to Recuse. In *Texaco*, the motion to

---

**17.** The designation "writ refused, no reversible error," in effect at the time *Texaco* was decided, meant that the Texas Supreme Court was not satisfied that the opinion of the court of appeals correctly declared the law. The designation simply meant that the supreme court found that the application presented no error requiring reversal. TEXAS RULES OF FORM (8th ed. 1992), Appendix A.

**18.** As noted earlier, TEX.R.CIV.P. 18b(2) (Vernon Supp.1988) provided for recusal where a judge's impartiality might reasonably be questioned, **including but not limited to,** personal bias or prejudice concerning the subject matter or a party or personal knowledge of disputed evidentiary facts concerning the proceedings.

recuse the trial judge was based on Canon 3 C of the Texas Code of Judicial Conduct. In that case, the lead counsel for Pennzoil, soon after an answer was filed in the case, gave the sum of $10,000 to the trial judge's campaign fund and also served on the trial judge's campaign steering committee. In its motion, Texaco argued that these actions created an appearance of impropriety on the part of the trial judge; however, the First Court of Appeals held that the campaign contribution did not constitute an appearance of impropriety.[19] I would decline to follow the holding of *Texaco,* not simply because the Texas Supreme Court refused to pass on the correctness of the appellate court's declaration the law, but rather on the basis that the general rule that political campaign contributions by attorneys to members of our judiciary do not create an appearance of impropriety or otherwise constitute circumstances under which the judge's impartiality might reasonably be questioned, does not apply to the extreme facts found in the instant case. While I readily concede that a campaign contribution **alone** might not create a reasonable question as to a judge's impartiality, more factors come into play in the instant case. Furthermore, the *Texaco* Court's reliance on *Rocha,* a case which found Canon 3 C of the Texas Code of Judicial Conduct not to have the force of law and which applied the constitutional yardstick for disqualification, is tenuous at best compared to the interpretation which this Court is required to give to TEX. R.CIV.P. 18b(2) (Vernon Supp.1988) in the instant case. The Texas Rules of Civil Procedure have the same force and effect as statutes. *Missouri Pacific Railroad Company v. Cross,* 501 S.W.2d 868, 872 (Tex.1973); *Freeman v. Freeman,* 160 Tex. 148, 327 S.W.2d 428, 433 (1959).

Given the significant distinguishing features of each of the cases on which the majority seeks to rely in overruling Appellants' Point of Error No. Five, I would find

that those cases do not support the recusal judge's ruling, and if the recusal judge based his decision to deny Appellants' Motion to Recuse on the above cases as "guiding rules and principles," as the majority opinion would suggest, then such decision is suspect. However, prior to a determination as to whether the decision of the recusal judge in denying the Motion to Recuse was an arbitrary or unreasonable act, other applicable statutory rules and principles must be analyzed.

As repeatedly noted, TEX.R.CIV.P. 18b(2) (Vernon Supp.1988), in effect at the time Appellants' Motion to Recuse was filed and heard, provided that judges **shall** recuse themselves in proceedings in which their **impartiality might reasonably be questioned.** In that regard, the conduct of judges, who are a highly visible symbol of government under the rule of law, is guided by the Texas Code of Judicial Conduct which is intended to establish standards for ethical conduct. Thus, the primary rules and principles to which reference was to be made by the recusal judge in the determination of whether or not to grant Appellant's Motion to Recuse are found in that Code. TEXAS SUPREME COURT, CODE OF JUDICIAL CONDUCT, Amended to April 1, 1988, *reprinted at* TEX.GOV'T CODE ANN., title 2, Subt. G, Appendix B (Vernon 1988). Given the limited but bizarre facts of the instant case, the sole issue presented in light of the rules and principles delineated in the Texas Code of Judicial Conduct, is whether a judge's impartiality can reasonably be questioned in a case where: (1) after the judge has denied substantive procedural relief requested in pending, active litigation, (2) he personally solicits and accepts a financial campaign contribution (3) from an attorney associated with that pending, active litigation, then (4) subsequently grants the relief which had previously been denied on the same basis, this time in favor of the attorney from whom he had just received

---

**19.** The questionable campaign contributions apparently did not stop at the trial level. Representatives of Texaco, apparently sensing that disposition of the $10.53 billion dollar case may be resolved on "sealed bids," donated $72,700 to seven justices on the Texas Supreme Court

which was hearing the appeal. Attorneys for Pennzoil, in turn, donated more than $315,000 to the justices. *See* Bradley A. Siciliano, *Attorney Contributions in Judicial Campaigns: Creating the Appearance of Impropriety,* 20 HOFSTRA L.REV. 217 (Fall 1991).

the financial campaign contribution. While my esteemed colleague in his separate concurring opinion would suggest that "reasonable" persons in Kansas, Alabama and Florida would be knowledgeable of the "facts of life" which surround the judiciary, I find it undeniable that the reasonable Texan might question the judge's impartiality in such a case. I would submit that the reasonable Texan truly envisions an independent judiciary, based simply on junior high social studies classes that emphasize that all men and women are equal under our laws.

The Texas Code of Judicial Conduct, in effect at the time of the solicitation and acceptance of the financial contribution provided in pertinent part as follows:

### Canon 1

#### A Judge Should Uphold the Integrity and Independence of the Judiciary

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should observe high standards of conduct so that the integrity and independence of the judiciary is preserved. The provisions of this Code shall be construed and applied to further that objective.

### Canon 2

#### A Judge Should Avoid Impropriety and the Appearance of Impropriety in All Activities

A. A judge should respect and comply with the law and should conduct himself or herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge should not lend the prestige of his or her office to advance the private interests of himself or herself or others; nor should he or she convey or permit others to convey the impression that they are in a special position to influence him or her.

### Canon 5

#### A Judge Should Regulate Extra-Judicial Activities to Minimize the Risk of Conflict with Judicial Duties

C. Financial Activities.

(1) **A judge should refrain from financial and business dealings that tend to reflect adversely on his or her impartiality,** interfere with the proper performance of the judicial duties, exploit his or her judicial position, or involve the judge in frequent transactions with lawyers or persons likely to come before the court on which he or she serves. [Emphasis added].

### Canon 7

#### A Judge Shall Refrain from Political Activity Inappropriate to the Judiciary

(1) Any candidate for elective judicial office, including an incumbent judge, and others acting on the candidate's behalf, **shall** refrain from all conduct which would violate the Election Code and/or this Code.

*See* TEXAS SUPREME COURT, CODE OF JUDICIAL CONDUCT, Amended to April 1, 1988, *reprinted at* TEX.GOV'T CODE ANN., title 2, Subt. G, Appendix B (Vernon 1988).[20] [Emphasis added].

The Texas Code of Judicial Conduct, unlike its counterpart applicable to the general membership of the State Bar of Texas, lacks commentaries which by way of expla-

---

**20.** On December 19, 1989, thirteen days after the date of the financial contribution, Canon 5 C(2) was amended to read as follows:

C. Financial Activities.

(1) A judge should refrain from financial and business dealings that tend to reflect adversely on the judge's impartiality, interfere with the proper performance of the judicial duties, exploit his or her judicial position, or involve the judge in frequent transactions with lawyers or persons likely to come before the court on which the judge serves. **This limitation does not prohibit either a judge or candidate from soliciting funds for appropriate campaign or officeholder expenses as permitted by state law.** [Emphasis added].

nation and examples are designed to provide guidance with respect to the purpose and meaning of the particular Canons. *See* Tex.Disciplinary R.Prof.Conduct (1989). It is nonetheless clear that the objective of the Code at the time of the solicitation and acceptance of the financial contribution, as well as at the present time, is to draw a line between approved and permissible conduct for judges and that which is disapproved and impermissible. In that regard, in interpreting the language as found in the Code, the use of the terms "shall" or "shall not" intend to impose binding obligations the violations of which can result in disciplinary action, while the use of the terms "should" or "should not" is intended as a statement of what is or is not appropriate conduct but not as a binding rule under which a judge may be disciplined. It is the use of the latter terms "should" and "should not" on which proper disposition of the instant case hinges.

Judges must uphold and adhere to standards of conduct that might be burdensome to other citizens, particularly other elected officials; however, the distinction between judges and judicial candidates and other elected officials is important to recognize. Judges are expected to be impartial, while executives and legislators are not. It is for those reasons that a judge should observe high standards of conduct so that the integrity and independence of the judiciary is preserved; conduct himself or herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary; refrain from conveying or permitting others to convey the impression that they are in a special position to influence him or her; and, refrain from financial dealings that tend to reflect adversely on his or her impartiality or exploit his or her judicial position. Texas Supreme Court, Code of Judicial Conduct, Amended to April 1, 1988, *reprinted at* Tex.Gov't Code Ann., title 2, Subt. G, Appendix B (Vernon

1988). Judges should be committed to the Code for no other reason than it is right.

Under our current structure, the position of a jurist in the United States in general, and the State of Texas in particular, is the symbol of both the judicial system and the orderly administration of justice. *See* Texas Lawyer's Creed—A Mandate For Professionalism, Section IV, subsec. 1, Texas Supreme Court adopted November 7, 1989. Public policy demands that a judge who tries a case act with absolute impartiality. *CNA Insurance Company v. Scheffey*, 828 S.W.2d 785, 792 (Tex.App.—Texarkana 1992, writ denied), citing *Prendergass v. Beale*, 59 Tex. 446, 447 (1883). It further demands that a judge appear to be impartial so that no doubts or suspicions exist as to the fairness or the integrity of the court.[21] *Id.; Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986). Judicial decisions rendered under circumstances that suggest bias, prejudice or favoritism undermine the integrity of the courts, breed skepticism and mistrust, and thwart the principles on which the judicial system is based. *Sun Exploration and Production Company v. Jackson*, 783 S.W.2d 202, 206 (Tex.1989) (Spears, J., concurring).

The political reality of judicial elections is that candidates must be able to raise money in order to be elected. But how can a judge remain a judge in the eyes of the reasonable Texan and not simply an ill-perceived politician masquerading in robes? The reality in contemporary political Texas is that if a judicial candidate raises money for a campaign, his or her impartiality might be questioned as a result of having received money and having entered into the political arena. On the other hand, if the trial judge tries to preserve his or her integrity and maintain an appearance of impartiality by refusing to raise funds, the election is destined to be lost. Another

---

**21.** I absolutely agree with Chief Justice Osborn's statement found in his concurring opinion that "I do not believe the 'reasonable person on the street' would conclude that receipt of a $100 contribution or even a $500 contribution, with today's standards and cost of campaigns, would result in a trial judge being bias or prejudiced."

However, once again I must emphasize that the question is not whether the $300 contribution in the instant case necessarily **resulted in the trial judge being biased or prejudiced,** but rather, whether such conduct raises a *reasonable question* as to the trial judge's impartiality.

reality is that to the reasonable Texan, attorney contributions, at best, create the appearance of impropriety and, at worst, given the facts of this case, amount to the appearance that justice can be bought at wholesale prices.[22] The majority opinion effectively holds that **no** solicitation of financial contributions by a judge can raise a reasonable question as to the judge's impartiality. This decision is unrealistic and is an open invitation for Texas jurists to test the limits and tolerance of reasonable Texans who already are clamoring for term limitations, ceilings on campaign spending, elimination of political action committees and subdistricts.

In the instant cast, the majority opinion, as well as the separate concurring, would suggest that the solicited and accepted "contribution was small, the trial judge maintained a voluntary policy of accepting only very limited contributions from any single source, and the contributing lawyer was not even lead attorney for defendants." Such rationalization of the facts of this case however, is not comforting to the single mother of five, unable to afford counsel of her choice for the purpose of enforcing child-support obligations, who discovers that opposing counsel attorney made a financial contribution to the judge's re-election campaign after her motion for contempt was filed, but prior to its disposition.[23] Likewise, it is not comforting to the many attorneys who practice in the courts of our state who are often susceptible to the pressure from judges who **personally** request campaign contributions from them.

Solicitation of campaign funding is an evil necessity of the electoral system and ties judges to a political process in which they should not take part. Legislators and executive officials at all levels of government often rely upon express or implied promises of material benefits to those who contribute to their campaigns. However, it is a well-established principle that no man or woman may have undue influence over the judicial branch of government. Justice **is** impartiality which is served only if all citizens are **seen** as equal in the courts that adjudicate their rights, regardless of their political preference or their ability to contribute to a judicial campaign. It is this appearance of independence of the judiciary which lends an aura of respect to those elected or appointed to serve the community as judges. Even an official whose political career may have been built upon bargaining for public office is endowed with a halo of unimpeachable respect once the individual steps into the role of judge.

The judicial branch is honored and respected by the public for its independence from the other branches of government and from concerns for the political ramifications to any judge resulting from his or her decisions. Any activity, regardless of the nature of its innocence, that casts doubt upon a judge's neutrality in a given case severely diminishes the image of the entire judicial branch of government. For this reason, Texas requires the recusal of a judge in any case where his or her impartiality might reasonably be questioned, regardless of any actual bias which may be held in a case. This rule recognizes the need for the judicial branch of government to maintain not only the utmost impartiality, but also the appearance of complete

---

**22.** Serious doubt is oftentimes cast upon the motives of attorneys who contribute to judicial campaigns. While some lawyers claim that they contribute to elect a higher quality judiciary, many lawyers make substantial contributions to judges who are running opposed, who are certain winners, and who are certain losers. Contributions are often sent to both sides in a race, or to the winner after the election. Furthermore, particular types of attorneys stand to gain if judges are elected who are more sympathetic to the kinds of clients that they represent.

**23.** A similar analogy would hold true if a member of this appellate court, after having issued this opinion, but during the pendency of a motion for rehearing, personally telephoned an attorney or other party in this case and solicited and accepted a political campaign contribution. The appearance of impropriety or the question of that judge's impartiality cannot necessarily be weighed simply on whether the contribution was "small," was personally solicited by the judge, was solicited during the pendency of this litigation or whether the contribution was or was not made by an attorney of record. Sometimes pleasant odors have a tendency to rise to the level of distaste when smelled in combination with other odors.

impartiality. Without that appearance, the public confidence in the judiciary is weakened; without that confidence, the judicial branch is powerless.

The line that determines when recusal is required and when it is not required is very fine. However, in the real world, the facts of this case would give the appearance of partiality which would mandate a recusal, notwithstanding the judge's genuine ability to maintain neutrality. It is for the above reasons that I would find that the trial judge's impartiality might reasonably be questioned, and I would accordingly sustain Appellant's fifth point of error. Although I differ from the majority's viewpoint on Appellant's Point of Error No. Five, I concur in its holding on the issue of limitations. If the trial judge had been recused, any judge hearing the case would have been required to grant judgment in favor of Appellees because the statute of limitations had clearly run. Thus, there was no harm to Appellants from the denial of their Motion to Recuse. Accordingly, I would affirm the judgment of the trial court under the statute of limitations and Tex.R.App.P. 81(b)(1), which provides that no error is reversible unless it caused the rendition of an improper judgment.